**The BAYLIS BROTHERS, INC.**

v.

**UNITED STATES.**

**C. D. 3383; Protest Nos. 64/17889–7706 and 65/4126–7757.**

United States Customs Court,
Second Division.

April 1, 1968.

Sharretts, Paley, Carter & Blauvelt, New York City (Gail T. Cummins, New York City, of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Charles P. Deem and Alfred A. Taylor, Jr., New York City, trial attorneys), for defendant.

Before RAO and FORD, Judges.

FORD, Judge:

The merchandise involved herein consists of smocked dress fronts imported

from the Barbados, British West Indies. The dress fronts covered by protest 64/17889 were classified by the collector as ornamented wearing apparel, unfinished, in chief value of cotton, under paragraph 1529(a) of the Tariff Act of 1930, as modified by T.D. 54108. The smocked dress fronts covered by protest 65/4126 were classified, according to the statements contained in the respective briefs of the parties, as "wearing apparel in part of smocking," in chief value of cotton, under item 382.03 of the Tariff Schedules of the United States. In each instance, the rate of duty assessed on the merchandise was 42½ per centum ad valorem.

Initially, it should be noted that, while the merchandise covered by protest 65/4126 was classified under TSUS item 382.03 apparently as "Wearing Apparel in Part of Smocking, C/V Cotton," *in haec verba* as they appear in the "Report of Collector on Protest," no such tariff description is found in TSUS. Accordingly, in TSUS terminology, the merchandise is deemed to have been classified under TSUS item 382.03 as "other women's, girls', or infants' wearing apparel, ornamented."

Plaintiff contends that the merchandise imported prior to the effective date of TSUS is properly dutiable at 20 per centum ad valorem as articles of wearing apparel, manufactured wholly or in part, in chief value of cotton, under paragraph 919 of the Tariff Act of 1930, as modified by T.D. 51802. The merchandise imported after the effective date of TSUS is claimed to be dutiable at 20 per centum ad valorem as women's, girls', or infants' wearing apparel, not ornamented, in chief value of cotton, not specially provided for, under TSUS item 382.33.

Concerning the claim under TSUS, the trial court, without objection from defendant's counsel, granted plaintiff's motion to amend protest 65/4126 by substituting item number 382.33 for item number 382.09. The trial court also

granted plaintiff's motion to consolidate the two protests for purposes of trial and for filing briefs. Counsel for the respective parties stipulated that the imported merchandise consists of unfinished wearing apparel wholly or in chief value of cotton. Although the dress fronts are unfinished articles, they are covered by paragraph 1529(a) by reason of the prefatory statement to such paragraph, as' they are covered by the relevant TSUS tariff descriptions by reason of General Interpretative Rule 10(h) of said TSUS which provides:

unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;

The competing provisions of the Tariff Act of 1930 are as follows:

Paragraph 919 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802—

Clothing and articles of wearing apparel of every description, manufactured wholly or in part, wholly or in chief value of cotton, and not specially provided for:

\*    \*    \*    \*    \*    \*

Other  .    .    .    .    .  20% ad val.

Paragraph 1529(a) of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108—

Articles (including fabrics), ornamented:

\*    \*    \*    \*    \*    \*

Provided for in subdivision [9] of paragraph 1529(a):

Wearing apparel (except gloves and mittens wholly or in chief value of wool)  .    .    .    .  42½% ad val.

A definition of the term "ornamented" is provided both under the Tariff Act of 1930 and in TSUS. The General

Agreement on Tariffs and Trade, T.D. 51802, provides:

> The word "ornamented," wherever used in any item 1529(a) of this Part, means "embroidered (whether or not the embroidery is on a scalloped edge), tamboured, appliqued, ornamented with beads, bugles, or spangles, or from which threads have been omitted, drawn, punched, or cut, and with threads introduced after weaving to finish or ornament the openwork, not including one row of a straight hemstitching adjoining the hem."

The competing provisions under the Tariff Schedules of the United States are as follows:

Item 382.03 Women's, girls', or infants' lace or net wearing apparel, whether or not ornamented, and other women's, girls', or infants' wearing apparel, ornamented ............................42.5% ad val.

---

Headnote 3(a), schedule 3, TSUS, reads as follows:

> 3. For the purposes of the tariff schedules—
>
> (a) the term *"ornamented"*, as used with reference to textile fabrics and other articles of textile materials, means fabrics and other articles of textile materials which are ornamented with—
>
> (i) fibers, filaments (including tinsel wire and lame), yarns, or cordage, any of the foregoing introduced as needlework or otherwise, including—
>
> (A) embroidery, and pile or tufting, whether wholly cut, partly cut, or not cut, and
>
> (B) other types of ornamentation but not including functional stitching or one row of straight hemstitching adjoining a hem; * * *

▇ The definition of ornamented under the provisions of the Tariff Act of 1930 makes it apparent that the only portion thereof applicable is that covering embroidery. By definition and legislative and judicial understanding, it is established that the operative feature of embroidery, for tariff purposes, is the ornamental characteristic of the stitching. See, Summary of Tariff Information, 1929, at page 2027; Marshall Field & Co. v. United States, 19 CCPA 366, T.D. 45509. Similarly, in common meaning, to embroider an object means to ornament it with needlework. Webster's Third New International Dictionary, 1966. Stitching is not embroidery in tariff terminology unless it is ornamental. United States v. Florea & Co., Inc., 25 CCPA 292, T.D. 49396.

By reason of Headnote 3 of TSUS, schedule 3, particularly Headnote 3 (a) (i) (B), the term "ornamented," as used with reference to textile fabrics, we note includes, in addition to embroidery, "other types of ornamentation," specifically excluding only functional stitching or one row of straight hemstitching adjoining a hem. However, we agree with the parties that embroidery is the term at issue.

▇ In short, the definition of the term "embroidery," when used in the tariff acts, ordinarily requires that for a thing to be embroidered, there must be an ornamental, superimposed stitching which is the result of needlework. United States v. Florea & Co., Inc., supra. In the instant case, there is no real dispute concerning the fact that the stitching is superimposed upon the dress fronts and is the result of needlework. Accordingly, we must consider the meaning of the word "ornamented."

There are numerous decisions involving the judicial construction of the words "ornament," "ornamental," "ornamented," and "ornamentation" which have been reviewed, as have those decisions setting forth the factors to be considered in determining issues similar to the one presented here. See, e. g., Rifkin Textiles Corp. v. United States, 54 CCPA ——, C.A.D. 925; Davies, Turner & Company v. United States, 39 CCPA 76, C.A.D. 466; United States v. Florea & Co., Inc., supra; United States v. Blefeld & Goodfriend, 24 CCPA 213, T.D. 48658; Marshall Field & Co. v. United States, 19 CCPA 366, 367, T.D. 45509; Paramount Bead Corp., Walter A. Yokel v. United States, 19 CCPA 385, T.D. 45522; United States v. H. A. Caesar & Co., 18 CCPA 106, T.D. 44067; United States v. Grass Bros., 13 CCPA 33, T.D. 40866; Woodruff & Co. v. United States, 2 CCPA 186, T.D. 31942; United States v. Field & Co., 10 CCPA 183, T.D. 38550; Bunker Hill Brick & Supply, Inc. v. United States, 46 Cust.Ct. 95, C.D. 2240; G. Hirsch Sons, Inc. v. United States, 28 Cust.Ct. 29, C.D. 1384.

■ No attempt will be made to coalesce these decisions in order to propound an interpretation of the word "ornamented" capable of application beyond the immediate issue. It is sufficient for present purposes that the decisions enable us to conclude, as we do, that if the effect produced upon the dresses by the stitching serves primarily a decorative as opposed to a useful function, the subject dress fronts are ornamented and by virtue of having superimposed stitching as a result of needlework are also embroidered.

In support of its claim, that the stitching has a utilitarian function, plaintiff introduced several exhibits and submitted the testimony of its president, Mr. M. D. Baylis. Plaintiff is a manufacturer of infants' and girls' dresses ranging from size 9 months to size 12. In describing his company's manufacturing process, Mr. Baylis explained that dresses are designed in plaintiff's design department. Piece goods, purchased from various sources of supply, are cut by electric cutting knives, and shipped to contracting factories for sewing.

The front section of the dresses (plaintiff's illustrative exhibit 1–A), a piece of cotton broadcloth, is cut and stenciled by laying a paper stencil over the fabric and rubbing a brush across it, thereby producing a series of dots on the fabric. These stenciled pieces, along with sewing thread, are then shipped to the Barbados, British West Indies, for "smocking."

In response to a question by the court, the witness explained that—

A smocking is a shirring technique, to shirr the fabric together, to give it elasticity so that when it has been sewed into the girl's dress, it permits quite a bit of latitude as far as the different sizes of girls are concerned, would fit into the dress. Little girls growing—one girl age 4 can be quite heavy; others slender, and the smocking does help fit, helps assure a better fit of many sizes of little girls, even within the particular size.

Mr. Baylis described the smocking operation, which he had observed in the Barbados, as follows:

The woman that is going to perform the smocking takes a piece of thread approximately 25 to 30 inches long, she cuts the thread that long, threads the needle; she starts at one end of the piece that has been stencilled, putting her needle into the stencilled dot, and picks up past the dot a piece of material, and then draws the thread through, which then shirrs the thread. She continues doing that, following the dots all the way across the fabric until that particular row has been finished. Then she does the same thing again with the second row, etc.

The stitch used in the smocking operation was characterized by the witness as a smocking or shirring stitch. The particular characteristic of a shirring stitch which distinguishes it from other types of stitches is that it draws the fabric up into a smaller piece than it was originally and creates a permanent

shirred piece of material. The designs and patterns on the dress fronts are determined by the designers in plaintiff's design department. The thread which is used to make the smocking is not always a different color from the fabric. The decision as to whether a contrasting or matching thread is used is made by plaintiff's designer.

Upon cross-examination, the witness was asked several questions apparently intended to elicit information concerning the significance of styling or fashion considerations in the selection of the colors or designs—as opposed to mere function—to be used on the subject dress fronts. The answers to these questions were, if not evasive, at least, unresponsive.

■ The discernible reluctance or hesitancy of the witness to acknowledge that style and appearance are considered in the design of the dress fronts may be attributed to the fact, acknowledged by the witness, that plaintiff's designer rather than the witness determined the style, the thread color to be used, and approved of the designs. The witness' contribution to the dress design apparently was limited to being "called in once in awhile" to give his opinion as to whether or not he liked a dress. However, notwithstanding this absence of competent testimony, we deem it a matter of common knowledge that fashion, styling, and appearance are significant factors in the design and manufacture of dresses. Certainly, in selecting the thread colors and designs of the subject dress fronts, which became dominant features of the dresses, plaintiff's designer did not consider only the claimed functional purpose of the smocking to the exclusion of the appearance of the garment.

Plaintiff argues that the testimonial record, together with the exhibits, establishes the functional nature of the smocking which primarily is for the purpose of allowing flexibility in size fit. The stitching, so it is claimed, creates an elasticity which enables a dress to fit little girls of different sizes. Therefore,

plaintiff asserts, since the stitching is primarily for a useful purpose and not for ornamentation, it should not be regarded as embroidery. Defendant, in contraposition, claims the primary purpose of the stitching is for ornamentation which, at best, also serves an incidental utilitarian purpose in allowing a slight stretching, if and when necessary, of the dress to fit a larger child.

■ We agree that in determining whether the dresses are ornamented, the evidentiary issue, as stated above, is whether the primary purpose of the stitching is for decoration rather than utility. The term "purpose" as used here, as well as in the decisions cited above, must, of course, be understood to mean function rather than the subjective intent of the manufacturers. It is the resultant effect of, and not the claimed motivation for, the stitching which determines the issue.

With respect to the claimed flexibility, the court is aware that there are differences in the relative or proportional dimensions of little girls. There can be no disputation of the witness' observation that one 4-year old girl can be quite heavy while others are slender. The dress that trimly fits the cherubic child would enshroud a girl of smaller dimensions. Therefore, a dress so constructed as to enable expansion in fit to accommodate little girls of varying dimensions might, in fact, serve a useful function. However, the claimed elasticity created by the subject smocked dress fronts does not, to a meaningful extent, so affect the expandability of a dress as to enable the same dress to fit little girls with different dimensions.

The elasticity of the smocked dress front permits, at most, some stretching only across the breadth of that portion of a dress which covers a little girl's body between her neck and abdomen. Chest measurements may differ among little girls wearing dresses from 9 months size to size 12, but so also are there differences in other relative proportional measurements which, among others, include

necks, shoulders, arms, waists, and hips as well as height. The elasticity of the smocked dress fronts might well introduce into the dress the capacity to accomodate the fit of the dress to one such differing dimension—across the girl's chest—but that is all.

▮ Therefore, even assuming the usefulness of a dress capable of accommodating the disproportioned body measurements existing among little girls, we conclude that the smocked dress fronts afford such a relatively minor contribution to that result as to make the elasticity and, therefore, the utility of the smocked dress fronts a relatively inconsequential feature of the dresses into which they are incorporated. In other words, the evidence concerning the claimed usefulness of the smocking in permitting size flexibility is insufficient to establish that the primary result of the stitching is utilitarian rather than decorative.

Plaintiff's brief also attempts to find, although plaintiff's witness did not so assert, another utilitarian function in that the stitching reduces the size of the dress front fabric piece to the size required to fit the completed dress. This reduction of the oversized fabric piece, it is claimed, converts the fabric into parts of dresses. However, it is specious to suggest that this is the primary purpose for stenciling the fabric piece and shipping it to the Barbados for stitching, and then returning it to this country when the fabric piece could be cut to proper size in plaintiff's plant merely by a more precise use of plaintiff's electric cutting knives.

This alternative contention of plaintiff's counsel is similar to the argument rejected as untenable by the court in Kayser & Co. (Inc.) v. United States, 13 Ct.Cust.Appls. 474, T.D. 41367. There it was claimed that ornamental raised stitching on the back of a glove was not embroidery for the reason that it was necessary for the proper completion of the glove. In dismissing the argument, the court expressed the opinion, applicable here, that—

> * * * It is apparent from an examination of these exhibits that by creasing or crimping the fabric and by stitching on each side of the points thus produced, gloves may be shaped, made and held to their form without embroidering points on the backs. True enough points made by creasing the fabric are not so pleasing as raised effects made of threads, but the crimped or creased points accomplish the *utilitarian* purpose desired just as effectively as ornamental or decorative needlework. As properly shaped and fitting gloves may be completed without using embroidered points, it follows that such embroidery work is not indispensable for the making of finished gloves. [Emphasis quoted.]

Because the issue here is determinable by a comparison of the utility of the importation with its decorative value, consideration must be given to the latter aspect even though the utility of the article has not been shown to be of more than minimal significance. The decorative quality of the smocked dress fronts cannot be appreciated from the testimonial record alone. For, if ever a sample is a potent witness, it is in a protest involving the issue of ornamentation.

The samples of the subject dress fronts and the dresses into which they are assembled are persuasive evidence of the fact that the stitching, sewn into crisscross and other attractive patterns of sometimes contrasting colors, enhances the decorative quality of the garments and adds to the basic dress an appearance of beauty, adornment, and stylishness.

▮ We hold, therefore, that the subject merchandise was properly classified as "ornamented," both under the Tariff Act of 1930 and under TSUS. The protests are overruled, and judgment will be entered accordingly.

RAO, Chief Judge, concurs.